**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BO SCRUGGS, | ) | CASE NO. 1:25-CV-491 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Bo Scruggs's application for Supplemental Security Income (SSI). Mr. Scruggs seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consent and Order, ECF No. 5.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. Scruggs's application for benefits.

## II.     PROCEDURAL HISTORY

In December 2022, Mr. Scruggs applied to the Social Security Administration (SSA) seeking SSI.[2] (Tr. 265.) He claimed that he became disabled on June 1, 2021. (*Id.*) He identified five allegedly disabling conditions: (1) attention-deficit/hyperactivity disorder; (2) oppositional

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 30"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 1513").

defiant disorder; (3) intermittent explosive disorder; (4) bipolar depression; and (5) post-traumatic stress disorder. (Tr. 304.)

The SSA denied Mr. Scruggs's application initially and upon reconsideration. (Tr. 113, 133.) Mr. Scruggs requested a hearing before an administrative law judge (ALJ). (Tr. 164.) The ALJ held a hearing on November 15, 2023, at which Mr. Scruggs was represented by counsel. (Tr. 85–112.) Mr. Scruggs testified, as did an independent vocational expert. (*Id.*)

On February 1, 2024, the ALJ issued a written decision finding that Mr. Scruggs is not disabled. (Tr. 14–31.)

Mr. Scruggs requested review of the ALJ's decision. (Tr. 235–36.) His counsel filed a brief identifying alleged errors in the ALJ's decision. (Tr. 378–79.) On January 23, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On March 12, 2025, Mr. Scruggs filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Scruggs asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ's RFC finding is not supported by substantial evidence because the underlying record does not support a finding that Plaintiff had no functional limitation in his ability to use his dominant right hand.
>
> **Second Assignment of Error:** The ALJ's RFC finding is not supported by substantial evidence in the absence of some explanation for the exclusion of a case-determinative social interaction limitation from the RFC finding.

(Pl.'s Merit Br. at 11, 14, ECF No. 7, PageID# 1513, 1516.)

2

III.     **BACKGROUND**

A.     **Personal, Educational, and Vocational Experience**

Mr. Scruggs was born in November 1989 and was 33 years old on the date of his application. (*E.g.*, Tr. 265.) Mr. Scruggs has experienced housing insecurity for many years; at the time of the hearing, he said he was living "outside" "in a tent in the woods." (*E.g.*, Tr. 91.) He is legally married, but he is separated from his partner. (Tr. 92.) He has worked sporadically, including through a staffing agency and at a restaurant, but he has never held a job longer than five months. (*E.g.*, Tr. 93.)

B.     **Function Reports**

Teresa Swanson completed a function report on Mr. Scruggs's behalf on January 12, 2023. (Tr. 312–19.) The report notes that Mr. Scruggs was living alone in an apartment. (Tr. 312.) Mr. Scruggs complained that his anxiety "triggers negative reactions," which has resulted in his being fired from multiple jobs. (*Id.*) He said that he also experienced difficulty remembering "time"; he would forget the day and miss work as a result. (*Id.*)

Mr. Scruggs's day consists of finding food for breakfast, spending most of the rest of the day seeking a place to sleep for the night, then taking his medications and finding food for the remainder of the day. (Tr. 313.) When his anxiety is heightened, he has difficulty resting and experiences bad dreams. (*Id.*) He sometimes forgets to bathe or eat, and uses phone reminders to brush his teeth, but he is otherwise able to see to his personal hygiene. (Tr. 313–14.) He is able to prepare frozen meals when they are available to him, which is about once every two weeks. (Tr. 314.) He is able to do house and yard work, but he does not do them "because it is forgotten." (*Id.*)

Mr. Scruggs tries to get outside every day. (Tr. 315.) He walks and is able to drive. (*Id.*) He is able to shop for food and hygiene products, but financially this is only possible once per month. (*Id.*)

Mr. Scruggs forgets to check his financial account statements and bill due dates, which has "been an issue for as long as he can remember." (*Id.*)

Mr. Scruggs enjoys watching anime, playing videogames, and skateboarding; he tried to do these hobbies daily but has recently started losing focus. (Tr. 316.) Every day, Mr. Scruggs communicates through text messages and over social media with others, through which he talks about current events. (*Id.*)

Mr. Scruggs's anxiety—which he said was brought on by "family alienation"—has been an issue for him "since childhood." (*Id.*) He is able to pay attention for about fifteen minutes at a time. (Tr. 317.) He follows written instructions "pretty well," but he needs spoken instructions to be broken down by step and then repeated. (*Id.*) He does not get along well with authority figures, and he gets into arguments with coworkers when he is critiqued at work. (*Id.*) He does not handle stress well, either; he either "freezes up" or "blows up." (Tr. 318.) He does not handle changes in routine well. (*Id.*)

### C.    <u>Relevant Hearing Testimony</u>

#### 1.    *Mr. Scruggs's Testimony*

Mr. Scruggs testified that he has struggled with housing for his "entire adult life." (Tr. 91–92.) He has "a hard time living with other people." (Tr. 92.) When asked to describe why he feels he is disabled, Mr. Scruggs identified a history of "chronic homelessness" and inability to maintain employment. (Tr. 93.) He said he had "a hard time with authority figures" and said he does not feel like he "fit[s] . . . into the world around [him]." (Tr. 94) Mr. Scruggs has been fired from jobs for "insubordination" and for attendance issues, but he has also quit jobs because he feels "overwhelmed" by the work. (Tr. 97.) He said that he had attended therapy for years, but had yet to "figure out what [he can] do" to "be a productive member of society." (Tr. 94.)

4

Mr. Scruggs testified that he sees a counselor every week and also treats with a psychiatrist. (Tr. 94.) He has medicine for anxiety that helps after he has a panic attack, but which does little to proactively "deal with" his social anxiety. (Tr. 95.) He has a panic attack every time he goes to the grocery store. (*Id.*) He finds that he becomes overwhelmed by the people at work, not tasks. (Tr. 97.) He can misinterpret other employees' actions, which can cause him to have an outburst. (Tr. 97–98.) He once was fired from a job for trying to "attack" another employee. (Tr. 98.)

Physically, Mr. Scruggs described trouble holding things with his right hand. (Tr. 95–96.) Because two of his fingers are numb, he also burns himself often. (Tr. 96.) Mr. Scruggs testified that he recently had additional testing, and his medical providers are planning to perform surgery on his hand. (*Id.*) He has trouble with things like buttons and zippers—anything "that requires [him] to twist or pull on anything." (Tr. 99.) He cannot pinch things between his thumb and index fingers. (*Id.*) He has trouble opening bottles, jars, and sometimes even bags of potato chips. (Tr. 100.)

Mr. Scruggs described that he was recently prosecuted for a theft because he grew angry with a gas station attendant and inadvertently left the store without paying for a drink he had picked up. (Tr. 101.) He was also recently forced to leave an apartment because of an argument with a roommate over rent money. (Tr. 102.)

Mr. Scruggs further finds that if his weekly telephone appointments are disrupted, it "throws off" "the whole week" and he has trouble keeping track of other appointments. (*Id.*) If he is not interested in a certain task, he has a hard time focusing on it. (Tr. 102–03.) He continues to have depression and endorsed thoughts of feeling as though he would "be better of like not existing." (Tr. 103.)

### 2.  *Vocational Expert's Testimony*

John Pullman testified as a vocational expert (VE) at the hearing. (Tr. 103.)

The ALJ asked the VE to assume that an individual is capable of medium-exertion work with certain exertional and non-exertional limitations. (Tr. 104.) The ALJ asked the VE to assume that that the person could frequently climb ramps, stairs, ladders, ropes, and scaffolds, but must avoid concentrated exposure to extreme cold and heat, fumes, odors, dust, gases, and poor ventilation. (*Id.*) Further, the individual must avoid even moderate exposure to hazards like unprotected heights and moving machinery. (*Id.*) For non-exertional limitations, the ALJ asked the VE to assume that the individual could understand, remember, and carry out simple instructions in a routine work setting with minor changes; the individual could respond appropriately to supervisors, co-workers, and work situations "if the tasks performed are goal-oriented," but that he could not engage in work at a production-rate pace. (*Id.*) The individual was capable of only superficial interaction, and the work performed must not require tandem work or any interaction with the public. (Tr. 104–05.)

The VE testified that such a person could perform the work of a hospital cleaner, laundry worker I, or laundry laborer. (Tr. 105.)

The ALJ next asked the VE to consider that the person from his first hypothetical was further limited to work at the light exertional level. (*Id.*) The VE testified that such a person could perform the work of a marker, housekeeping cleaner, or folding machine operator. (Tr. 105–06.)

The ALJ next asked the VE to consider that the person from the first two hypotheticals was further limited in that they could only frequently handle and finger with the right hand. (Tr. 106.) The VE testified that all six of the representative jobs would remain open to such a person. (*Id.*)

The ALJ asked the VE to further limit the hypothetical individual to occasional handling and fingering. (Tr. 106–07.) The VE testified that all the positions he identified at both the medium and light exertional levels would be eliminated for such a person. (Tr. 107.)

The VE further testified that competitive employment would be precluded for a person who would be off-task for 20 percent of the work day or who would be absent two times per month on a routine basis. (Tr. 107–08.)

In response to questioning from Mr. Scruggs's counsel, the VE further confirmed that all the positions he identified were unskilled positions requiring some, but limited, interaction with supervisors where the supervisor would be showing the employee how to perform their work duties. (Tr. 108.) Therefore, if the hypothetical person was further limited in that they could have absolutely no "over-the-shoulder supervisory scrutiny," that limitation would be work-preclusive. (Tr. 108–09.) Similarly, if the hypothetical person required complete isolation at work, with no interaction with coworkers, supervisors, or the public, that limitation would be work-preclusive. (Tr. 109.) And if the person's supervisors must provide only supportive feedback, as opposed to corrective feedback, such a condition would also be "very hard" to accommodate. (Tr. 109–11.)

### D. State Agency Consultants

A disability examiner (Kyle Yator) and a psychologist (Jennifer Swain) reviewed Mr. Scruggs's claim at the initial review level. (Tr. 113–22.) Dr. Swain opined that Mr. Scruggs has moderate limitations with respect to the ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage himself. (Tr. 118.)

Dr. Swain reviewed the medical evidence and opined that Mr. Scrugg's reported symptoms were only partially consistent with the record evidence, noting that he has mental diagnoses and a history of hospitalizations for suicidal ideation, but that his mental status examinations were within normal limits. (Tr. 119.) Dr. Swain opined that Mr. Scruggs was able to comprehend, remember, and carry out simple (one- to two-step instructions) and—occasionally—three- to four-step instructions, but he would need a setting without a "fast pace demand." (Tr. 119–20.) Dr. Swain

7

further opined that Mr. Scruggs "is susceptible to misinterpreting interpersonal nuance" but "can relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny." (Tr. 120.) He may not "supervise or persuade others or . . . deal with the public." (*Id.*) Mr. Scruggs could adapt and manage himself "in a structured and predictable work setting, where changes can be easily explained." (*Id.*)

In explaining these opinions, Dr. Swain noted, among other things, that the recent medical records had documented significant improvement with medication and that Mr. Scruggs's activities of daily living as of January 2023 "suggest[] adequate daily function." (Tr. 121.)

Based in part of these opinions, the consultants found that Mr. Scruggs was not disabled. (Tr. 122.)

In a letter explaining this decision to Mr. Scruggs, the SSA wrote that "[a]t times you may be nervous, anxious, or depressed" but that he was "still able to remember and carry out simple work instructions" and "do work that does not involve contact with a great deal of people" (Tr. 144.)

A disability examiner (Mollie Moore), a physician (Leon Hughes, M.D.), and a psychologist (David Dietz, Ph.D.) reviewed Mr. Scruggs's claim at the reconsideration level. (Tr. 123–33.)

Dr. Dietz opined that the findings from the initial review level "remain consistent and supported by the evidence in [the] file." (Tr. 127, 131.)

Dr. Hughes opined that Mr. Scruggs had no physical manipulative limitations. (Tr. 129.) He opined that Mr. Scruggs could occasionally lift or carry up to 50 pounds and could occasionally lift or carry up to 25 pounds. (Tr. 128–29.) In explaining these conclusions, Dr. Hughes wrote that

Mr. Scruggs's symptoms were only partially consistent with the record evidence because recent x-rays showed only "moderate obstruction and minimal arthritis." (Tr. 128.) Dr. Hughes wrote that the May 2023 opinion from Bradford Medical Group was "vague and not entirely supported" because it "contrasts with other evidence in the record." (*Id.*)

Based on these opinions, the consultants determined that Mr. Scruggs was not disabled. (Tr. 133.)

In a letter explaining this decision to Mr. Scruggs, the agency wrote that examinations revealed that he was "still capable of completing simple work-related tasks" and that his physical conditions "do not impact your ability to lift objects." (Tr. 159.)

### E.    Relevant Medical Evidence

Mr. Scruggs presented to the emergency room in June 2021 after asking the police to shoot him (Tr. 1248). He described a significant personal life stressor and was admitted as an inpatient psychiatric patient from August 20 to 23, 2021 for suicidal ideations (Tr. 706, 779–80). He presented to the emergency room again on September 28, 2021, for suicidal ideations, describing that he planned to commit suicide by carbon dioxide poisoning. (Tr. 735.) Mr. Scruggs next presented to the emergency room on October 27, 2021, again with suicidal ideations involving gas poisoning or a traffic accident (Tr. 702). He was admitted that day and was discharged on October 29, 2021 (Tr. 1038).

In March 2022, Mr. Scruggs's roommate stabbed him with a knife in the right forearm during an argument. (Tr. 1439.)

On April 14, 2022, neurosurgeon Dennis Kao, M.D. evaluated the stab wound. (Tr. 700.) Dr. Kao found decreased sensation in the right ring and pinky fingers, in ulnar nerve distribution; positive Wartenberg's sign (with inability of finger adduction of the right ring and small finger); and lack of right thumb adduction. (Tr. 700.) Dr. Kao wrote that Mr. Scruggs likely sustained an

ulnar nerve and ulnar artery transection "at the mid forearm level." (*Id.*) Dr. Kao and Mr. Scruggs discussed surgical options. (Tr. 700– 01.)

On May 4, 2022, Mr. Scruggs called Cleveland Clinic's social work department and expressed frustration that no one would help him, that he could not find shelter, and that a local homeless shelter had refused to allow him to stay there. (Tr. 690).

Mr. Scruggs followed up with Dr. Kao on May 12, 2022. (Tr. 428.) He had right grip weakness and was unable to flex his two fingers; he also had difficulty completely flexing the middle finger. (*Id.*) However, Dr. Kao noted that Mr. Scruggs manipulated a phone and small objects "well" (*Id.*). His rapid alternating movements were symmetrical and normal, and he had no tremor or muscle atrophy. (*Id.*) He was scheduled for surgery. (Tr. 429.) Mr. Scruggs underwent ulnar nerve reconstruction surgery on May 13, 2022 (Tr. 421–25).

Mr. Scruggs re-initiated psychiatric services on May 24, 2022. (Tr. 648.). He described isolating from others and said he was anxious about an ongoing court case; he was depressed that he had been unable to work following the recent wrist surgery (Tr. 652, 658, 673). Mr. Scruggs said he had been homeless and "couch surfing" since the stabbing incident. (Tr. 596.) On examination, Mr. Scruggs was well groomed, maintained good eye contact, and displayed a "friendly demeanor" (Tr. 598). His thought process was organized and logical (Tr. 598). He was cooperative and engaged (Tr. 599).

Mr. Scruggs underwent a psychological examination on June 22, 2022 (Tr. 913). He reported feeling suicidal and overwhelmed with everything (*Id.*). Mr. Scruggs complained of pain in his left shoulder but denied any other pain, discomfort, or complaints or problems (Tr. 915). The examiner noted that Mr. Scruggs was cooperative (*Id.*). His mood was depressed, but his speech

was normal and his thought processes were linear and organized (*Id.*). His attention, concentration, and memory were intact (Tr. 916).

Mr. Scruggs received was an inpatient psychiatric patient from June 22, 2022 to June 30, 2022 for this increased depression, loneliness, and suicidal ideations (Tr. 913, 924). On discharge, Mr. Scruggs was not depressed, manic, or suicidal. (Tr. 925). He was described as hopeful and optimistic. (*Id.*). His mood was better, and his insight and judgment were good (Tr. 926).

During a July 2022 session Mr. Scruggs was able to attend to tasks with appropriate affect and no other remarkable features (Tr. 644). He said he was recently hired full-time at a diner (Tr. 644).

On August 1, 2022, Plaintiff asked his primary care doctor for a refill of his psychiatric medications because he had missed an appointment with his psychiatrist (Tr. 670).

At a therapy appointment on October 20, 2022, Mr. Scruggs reported missing his last appointment due to losing track of what day it was. (Tr. 613.) Mr. Scruggs stated that his legal problems were the result of a conspiracy of masonic lodge brothers who set him up. (*Id.*)

On November 2, 2022, Mr. Scruggs was discharged from psychiatric services due to non-responsiveness. (Tr. 1074.) Mr. Scruggs was an inpatient psychiatric patient from December 3, 2022 to December 8, 2022 for worsening depression and suicidal ideations (Tr. 982, 998). He returned to re-initiate psychiatric services on February 2, 2023.

On February 2, 2023, Mr. Scruggs presented for an initial psychiatric evaluation at Signature Health (Tr. 1111). He noted that he felt more stable and remarked that he was working. (*Id.*). He indicated that his separation from his wife had caused suicidal depression "for awhile," but he denied suicidal ideation at the time of the examination (*Id.*). On examination, Mr. Scruggs's appearance was appropriate, and he displayed good eye contact; his mood was depressed and

anxious, but his thought content and process were unremarkable (Tr. 1113). His insight and judgment were appropriate (Tr. 1113). At an examination the following month, Mr. Scruggs was generally relaxed, engaged, and cooperative with normal speech (Tr. 1126). He reported an improvement of his depression but a worsening of his anxiety (Tr. 1125).

Mr. Scruggs underwent a consultative medical examination on May 22, 2023, which was conducted by Dorothy Bradford, M.D. (Tr. 1144–52). On examination, Mr. Scruggs exhibited normal grip strength in both hands. (Tr. 1145). Range of motion was normal in all areas. (Tr. 1148). He had decreased light touch in two of the fingers on his right hand but exhibited normal motor strength. (Tr. 1152.) Dr. Bradford concluded that Mr. Scruggs had a "mild sensory right ulnar neuropathy" as a result of the stabbing laceration; she asserted that it should improve. (*Id.*) Dr. Bradford stated that Plaintiff had "no activity restrictions." (*Id.*)

At an appointment on July 13, 2023, Mr. Scruggs reported that he was doing well on his medications and that he had started therapy, which also helped. (Tr. 1174). He was engaged and cooperative. (Tr. 1176.) He identified that one of his strengths was that he was articulate. (Tr. 1410.) He also remarked that he communicated "very well." (Tr. 1410).

At an August 2023 session, Plaintiff reported that it had been rough over the past week due to his living situation, but he presented as calm, attentive, and relaxed (Tr. 1391).

At an appointment in October 2023, Mr. Scruggs reported that he was relieved because he had been approved for a housing voucher; he noted that he was much more at ease since his living situation had resolved. (Tr. 1332.) He was engaged, his appearance was appropriate, and his behavior was relaxed and cooperative. (*Id.*). The examiner also described Mr. Scruggs as calm and attentive. (Tr. 1332.)

A November 2, 2023 examination of Mr. Scruggs's right forearm by Dr. Kao was notable for positive Tinel's sign in the right mid-forearm and carpal tunnel, positive Froment sign, muscle atrophy of first dorsal interosseous, claw deformity of ring and small fingers, positive Wartenberg sign, healed burn scars on small finger, positive Phalen's test, positive Durken's test, positive thumb opposition, and ulnar nerve numbness. (Tr. 1430, 1440.) Dr. Kao discussed a potential sensory nerve transfer surgery and ordered an EMG/NCS of Plaintiff's right arm. (Tr. 1441.)

That testing revealed the following:

> Changes consistent with a subacute on chronic right ulnar mononeuropathy, predominantly axon loss in type and severe in degree electrically, characterized by the following: Absence of the right ulnar sensory response, recording the fifth digit (noting the absence of the ulnar palmar mixed nerve response as well). Absent right ulnar motor response recording the abductor digiti minimi (ADM) muscle. Moderate-to-severe chronic motor axon loss changes in right first dorsal interosseous (FDI) muscle, with abundant active/ongoing motor axon loss changes in the right FDI as well. However, the right flexor digitorum profundus to digits 4&5 is conspicuously spared on NEE, favoring right ulnar nerve lesion localization distal to the branch supplying this muscle. If clinically indicated, neuromuscular ultrasound may be pursued to further refine lesion localization.

(Tr. 1468.)

## IV.   THE ALJ'S DECISION

The ALJ determined that Mr. Scruggs had not engaged in substantial gainful activity since October 27, 2022, the application date. (Tr. 19.)

The ALJ next determined that Mr. Scruggs had the following severe impairments: (1) chronic obstructive pulmonary disease (COPD); (2) osteoarthritis; (3) depressive disorder; (4) anxiety disorder; (5) "trauma and stressor related disorder"; (6) attention-deficit/hyperactivity disorder (ADHD); and (7) "drug addiction disorder." (Tr. 20.)

The ALJ then concluded that none of Mr. Scruggs's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Scruggs had the residual functional capacity ("RFC") to perform work at the medium exertional level (as defined at 20 C.F.R. 416.967(c)) but with several exertional and non-exertional limitations. (Tr. 22.) With respect to exertional limitations, the ALJ found that Mr. Scruggs could frequently climb ladders, ropes, scaffolds, ramps, and stairs, but must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust, gases, and poor ventilation. The ALJ further determined that Mr. Scruggs must avoid even moderate exposure to hazards, such as moving machinery and unprotected heights. (*Id.*)

With respect to non-exertional limitations, the ALJ found as follows:

> The claimant can understand, remember, and carry out simple and occasional complex instructions in a routine work setting with minor changes. He can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace. The work should not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others. There should be no tandem work or interaction with the public.

(*Id.*)

The ALJ found that Mr. Scruggs was 32 years old on the application date, had at least a high school education, and had no past relevant work. (Tr. 29.) The ALJ then determined that—considering Mr. Scruggs's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "hospital cleaner" (DOT 323.687-010), "laundry laborer" (DOT 362.687-010), or "marker" (DOT 209.587-034). (Tr. 19–30.) Accordingly, the ALJ determined that Mr. Scruggs is not disabled. (Tr. 30–31.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

15

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

      **B.**      <u>Standard for Disability</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. **Analysis**

#### 1. *Alleged Step Two Error – Mr. Scruggs's Dominant Hand and Arm*

In the first part of his first assignment of error, Mr. Scruggs suggests that the ALJ erred at Step Two when the ALJ found no severe impairment with respect to Mr. Scruggs's stabbing injury.

Mr. Scruggs points to evidence in the record substantiating that he was stabbed in the right forearm in March 2022; that in the following month he was found to have decreased sensation, positive Wartenberg's sign, and a lack of right thumb adduction; that in May 2022 he underwent ulnar nerve construction surgery; and that testing and consultation in November 2023 revealed continued abnormal findings with respect to Mr. Scruggs's facility with his right arm and hand. (Pl.'s Br. at 11–13, PageID# 1513–15.)

17

The Commissioner defends the ALJ's decision, pointing out that the ALJ indicated that the ALJ considered all of Mr. Scruggs's impairments—both severe and non-severe—when crafting the RFC, specifically discussing Mr. Scruggs's allegations about his right-upper-extremity limitations when explaining the conclusions about the RFC. (Def.'s Br. at 10, ECF No. 10, PageID# 1534.)

Mr. Scruggs does not specifically address the Commissioner's argument as to this aspect of his first assignment of error in his reply brief. (Reply, ECF No. 11.)

The Court agrees with the Commissioner on this issue. Any error at Step Two here would be legally harmless.

As discussed further above, at Step Two the ALJ found Mr. Scruggs to have a number of severe medically determinable impairments. (Tr. 20.) While the ALJ found any impairment with respect to Mr. Scruggs's right upper extremity to be non-severe, the ALJ continued through the remaining steps of the sequential analysis based on his other, severe, impairments. When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent steps in the sequential evaluation process, any error at Step Two is harmless. *E.g.*, *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Having found any error at Step Two to be harmless, I turn to a consideration of whether the exertional limitations were supported by sufficient evidence. In other words, I consider whether the RFC is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support'" those conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"[A]n ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No.

18

5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (*quoting Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Mr. Scruggs points to evidence in the record substantiating that he was stabbed in the right forearm in March 2022; that in the following month he was found to have decreased sensation, positive Wartenberg's sign, and a lack of right thumb adduction; that in May 2022 he underwent ulnar nerve construction surgery; and that testing and consultation in November 2023 revealed continued abnormal findings with respect to Mr. Scruggs's facility with his right arm and hand. (Pl.'s Br. at 11–13, PageID# 1513–15.)

The Commissioner defends the ALJ's decision, noting that the ALJ specifically acknowledged the March 2022 stabbing and the objective evidence Mr. Scruggs identifies. (Def.'s

Br., ECF No. 10, PageID# 1532.) The Commissioner points out that Mr. Scruggs was able to adequately manipulate a phone and other small objects as early as May 2022, that he denied pain in his right arm or hand in June 2022, and that Dr. Bradford's November 2023 consultative examination revealed normal grip strength, normal range of motion, and normal motor strength, with a good prognosis and no opined activity restrictions. (*Id.* at PageID# 1532–33.) The Commissioner further points out that Dr. Hughes opined that Mr. Scruggs had no manipulative limitations. (*Id.* at PageID# 1533.)

Here, the Court is convinced that substantial evidence supports the ALJ's findings and the ALJ did not err in finding that Mr. Scruggs did not require manipulative limitations.

The ALJ acknowledged Mr. Scruggs's testimony about the extent of the difficulties he experiences as a result of his stabbing and accurately summarized the medical evidence related to his upper extremity. (Tr. 23–24.) The ALJ found that Mr. Scruggs's statements about the extent of the limitations stemming from his injury were "somewhat inconsistent with the evidence in the record." (Tr. 23.) The ALJ detailed that several examinations showed that Mr. Scruggs had normal motor strength and range of motion and was able to make a full fist and could fully extend all digits (*Id.*) The ALJ further noted that the consulting examination revealed that Mr. Scruggs had normal strength, deep tendon reflexes, gait, and range of motion. (Tr. 27.)

Moreover, the ALJ's ultimate conclusions were consistent with the opinion of state agency consultant Dr. Hughes.

Mr. Scruggs does not point to any inaccuracies in the ALJ's recitation of the medical evidence. Instead, he argues that the consulting examiner and state medical consultants' opinions that his neuropathy was "mild" were wrong, pointing to the November 2023 EMG that showed noted, among other things, abnormalities that were "severe in degree electrically" and consistent

with "moderate-to-severe chronic motor axon loss changes." (Reply, ECF No. 11, PageID# 1542.) Mr. Scruggs acknowledges that the ALJ summarized the November 2023 results but insists that the ALJ should have found that the consulting examiner and state agency examiner's opinions were not supported by that opinion.

I am convinced that this is a case falling within that "zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Again, a reviewing court may not "resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). And even if "a preponderance of the evidence . . . supports the claimant's position," the Court must affirm if "substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

The ALJ carefully considered the record, including the records that Mr. Scruggs points to as supporting his desired exertional limitations, and the Court is convinced that substantial evidence supports his conclusions.

Accordingly, Mr. Scruggs's first assignment of error is overruled.

### 2.  *Alleged RFC Error – Social Interaction Limitation*

In his second assignment of error, Mr. Scruggs contends that the ALJ erred when crafting the RFC when the ALJ failed to explain why he did not include a limitation that Mr. Scruggs could be exposed to "no over-the-shoulder supervisor scrutiny," a limitation recommended by Drs. Swain and Dietz. (Pl.'s Br. at 15, ECF No. 7, PageID# 1517.) Mr. Scruggs acknowledges that the ALJ found those opinions to be largely supported, although with "somewhat different functional limitations." (*Id.* at PageID# 1518.) But Mr. Scruggs contends that the ALJ's translation of the

agency consultants' statement of "over-the-shoulder scrutiny" amounted to a rejection—without explanation—of a medically opined limitation. (*Id.* at PageID# 1519.)

The Commissioner defends the ALJ's decision, arguing that the ALJ was not required to adopt a limitation opined by the state agency psychological consultants, that in any event the ALJ here *did* incorporate the opined limitations "but phrased them differently," and that the ALJ's ultimate limitations as stated in the RFC were reasonable and supported.

In reply, Mr. Scruggs directs the Court to *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365 (6th Cir. May 20, 2024), arguing that this is also a case where the ALJ found that a medical opinion was persuasive but decided not to include all the limitations set out in that medical opinion.

After careful consideration, the Court agrees with the Commissioner.

Even where an ALJ provides "great weight" to a medical opinion, there is no requirement that an ALJ adopt the verbatim language of that opinion. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which he gave great weight); *Jordan v. Comm'r of Soc. Sec.*, No. 5:17-cv-02466, 2018 WL 5884830, at *10 (N.D. Ohio Nov. 9, 2018) ("Jordan's contention that the ALJ's RFC is not supported by substantial evidence because it does not include each and every limitation contained in the medical opinions that were assigned 'weight' is unavailing"); *cf. Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4, 2020), *report and recommendation adopted*, 2020 WL 1041213 (holding that ALJ did not err in failing to include limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined").

22

Here, the state agency psychological consultants opined that Mr. Scruggs could work in an environment that would not include "over-the-shoulder supervisor scrutiny." The consultants did not explain what they meant by that phrase, but they did state the opinion that Mr. Scruggs has only a moderate limitation with respect to his ability to interact with others. (*E.g.*, Tr. 118.) They found that he was capable of asking simple questions, requesting assistance, and maintaining socially appropriate behavior without significant limitation. (Tr. 120.) His ability to accept instructions and respond appropriately to supervisor criticism was only moderately limited. (*Id.*)

The ALJ found these opinions to be partially persuasive, concluding that "the totality of the evidence is consistent with somewhat different functional limitations." (Tr. 28.) The ALJ acknowledged that the record reflected "a number of psychiatric hospitalization[s]," "some mood abnormalities," and "some irritability and altercations," although interspersed with normal findings describing him as attentive and pleasant with normal eye contact. (Tr. 28–29.) In weighing this evidence, the ALJ determined and clearly stated that the "objective medical evidence and opinion evidence . . . suggest greater sustained capacity than described by the claimant," such that—with respect to social-interaction limitations—Mr. Scruggs was only limited to superficial interaction. (Tr. 29.) The ALJ defined that term to mean work that "does not require negotiating with, instructing, persuading, or directing the work of others." (*Id.*)

The Court agrees with the Commissioner that this limitation adequately accounts for the opined limitations of the agency consultants.

The ALJ's questioning of the VE at the hearing helps shed light on the ALJ's reasoning. The VE testified that "over-the-shoulder supervision" was not defined in the DOT or its companion volumes. (Tr. 109.) The VE testified that, in his experience, he would consider such supervision to be "hovering," providing feedback on each specific action as right or wrong, which can be

"distracting" or lead to "complications." (Tr. 110.) The VE contrasted that type of supervision with the level of supervision in the unskilled occupations he identified in response to the ALJ's hypotheticals; the unskilled positions would only require "some interaction" with a supervisor to teach the employee for "a limited amount of time" while the employee becomes familiar enough with the position to reach average performance. (Tr. 108.) The VE explained that, in most workplaces, there would be times where an employee would need to be corrected, but supervisors would not generally be looking to "handhold them." (Tr. 111.)

The Court notes that the ALJ, earlier in the opinion, also stated his conclusion that Mr. Scruggs has only a moderate limitation with respect to the ability to interact with others. In explaining this opinion, the ALJ noted that—while there were records showing Mr. Scruggs as guarded, tearful, irritable, or susceptible to altercations—there were also records showing him as pleasant, bright, smiling, , jovial, pleasant, and cooperative, with good eye contact and appropriate appearance. (Tr. 21.)

Reading the ALJ's decision as a whole and with common sense, as required, the Court is able to trace the ALJ's reasoning on this issue. The ALJ found that Mr. Scruggs retained the ability to interact superficially with supervisors, and his definition of such interaction was consistent with the quality of supervision identified by the VE for the unskilled positions identified at the hearing. The ALJ asked the VE what, vocationally, an "over-the-shoulder" limitations might mean in practice. Based on the VE's testimony, it seems to the Court that the RFC adequately accounts for the opined limitations of the agency consultants.

In other words, this is a case where the ALJ's RFC finding does not outright contradict the opinions of the agency consultants. *See Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4, 2020), *report and recommendation adopted*, 2020 WL 1041213 (holding

that ALJ did not err in failing to include limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined").

Before concluding, the Court notes that it also found it significant that Mr. Scruggs does not identify any opinions from a medical source assessing a functional limitation more limited than the RFC. *See Audino v. Comm'r of Soc. Sec.*, No. 4:17CV1594, 2018 WL 3520836, at *8 (N.D. Ohio July 5, 2018), *report and recommendation adopted sub nom. Audino v. Berryhill*, 2018 WL 3496084 (N.D. Ohio July 20, 2018) (rejecting claimant's argument that the ALJ should have obtained medical expert testimony, in part, because the claimant "d[id] not cite to any pertinent limitations opined by any medical source and not addressed by the ALJ").

Because the ALJ's RFC adequately accounts for the opinions of the state agency psychological consultants, Mr. Scruggs's second assignment of error is overruled.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision.


Dated:  October 1, 2025                    /s *Jennifer Dowdell Armstrong*
                                           Jennifer Dowdell Armstrong
                                           U.S. Magistrate Judge